(C. D. 1273)

Sandoz Chemical Works, Inc. *v.* United States

United States Customs Court, First Division

(Decided September 14, 1950)

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.*, of counsel) for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*John J. McDermott*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Plaintiff, whose business includes the manufacture of pharmaceuticals, imported from Switzerland, a digitalis glucoside, known as cedilanid substance. The merchandise, plaintiff's exhibit 1, consists of a hermetically sealed glass container with a capacity of approximately 340 cubic centimeters, holding 100 grams of the cedilanid substance, being a white powder possessing therapeutic properties.

The collector classified the shipment as a digitalis glucoside in ampoules under the provisions of paragraphs 5 and 23, as amended by the trade agreement with Switzerland, 69 Treas. Dec. 74, T. D. 48093, and assessed duty at 15 per centum ad valorem. Plaintiff claims that the commodity is a drug of vegetable origin, advanced in value or condition, and therefore classifiable under paragraph 34 of the Tariff Act of 1930, as amended by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, carrying a duty assessment of 5 per centum ad valorem.

Pertinent paragraphs of the statutes are quoted in the margin.[1]

---

[1] Paragraph 5, Tariff Act of 1930:

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

Paragraph 23, Tariff Act of 1930:

PAR. 23. Chemicals, drugs, medicinal and similar substances, whether dutiable or free, when imported in capsules, pills, tablets, lozenges, troches, ampoules, jubes, or similar forms, including powders put up in medicinal doses, shall be dutiable at not less than 25 per centum ad valorem.

The issue has been narrowed by virtue of a stipulation, in which the parties agree that the cedilanid substance is, in fact, a drug of the class provided for in paragraph 34, as amended, *supra*. Thus, the sole question for determination concerns the glass container, i. e., whether it is an ampoule, as contemplated by paragraph 23 of the Tariff Act of 1930. If it is, the collector's classification must be sustained; if it is not, plaintiff's claim is good.

Both sides introduced oral testimony and illustrative exhibits. Plaintiff's evidence presents a comprehensive picture, showing the preparation, nature, and use of the digitalis glucoside (cedilanid substance), and the type of container in which imported. A summary of the evidence follows.

Cedilanid substance is highly toxic and therefore is incapable of use *per se* as a medicine, but is employed only with other ingredients in preparations, as tablets, suppositories, or in solution, used as remedies for heart ailments, principally congestive heart failure and disorders of heart rhythm.

All of the imported drug was used in the manufacture of cedilanid tablets, plaintiff's illustrative exhibit A, prepared by mixing the cedilanid substance with milk sugar, powdered sugar, and starch. The mixing is done in a boring mill and continues for 4 hours. After the mixture is removed from the mill, lubricants are added and the use of alcohol and water brings the material to proper consistency as a semisolid mass which is granulated, then dried, and compressed into

Paragraphs 5 and 23, Tariff Act of 1930, as modified by the trade agreement with Switzerland, 69 Treas. Dec. 74, T. D. 48093:

| Tariff Act of 1930, paragraph | Description of articles | Rate of duty |
|---|---|---|
| 5 and 23 | Salts and compounds of gluconic acid and combinations and mixtures of any of the foregoing; digitalis glucosides, and ergotamine tartrate; all the foregoing not specially provided for, whether or not in any form or container specified in paragraph 23 | 15% ad val. |

Paragraph 34, Tariff Act of 1930, as amended by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802:

| Tariff Act of 1930, paragraph | Description of products | Rate of duty |
|---|---|---|
| 34 | Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin (except halibut-liver oil); any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, and not containing alcohol | 5% ad val. |

tablets of definite shape and weight. After coating, the tablets are finally wrapped and packed.

The contents—100 grams—of the glass container, plaintiff's exhibit 1, *supra*, are sufficient for the preparation of 200,000 tablets, each containing 0.5 milligrams of the medicinal substance. Dosages consist of one or two tablets, depending on the advice of a physician. When the cedilanid substance is reduced to solution—another form in which it is administered—the drug is packed in ampoules, holding 2 to 4 cubic centimeters.

Hermetically sealing the glass container does not sterilize the drug, which is not sterile when packed. Manipulation, in the process of hermetically sealing, consists of saturating the glass container in inert gas for removal of air, and, after inserting the weighed contents, the neck of the container is constricted and sealed with a flame. The purpose of the process is to protect the medicinal from the influence of air and moisture and prevent general decomposition.

To remove the cedilanid substance, the neck of the container is filed off. All of the 10 containers, comprising the shipment in question, were thrown away after being emptied. There is some testimony that articles, substantially the same as the receptacle under consideration, have been used as boiling flasks or for storing liquids in chemical and laboratory operations after the contents have been consumed. To what extent such use is made of the discarded containers, the record is not clear.

The imported cedilanid substance is not a drug in any of the forms named in paragraph 23, *supra*, as represented by the following exhibits: A capsule, plaintiff's illustrative exhibit B; a pill, plaintiff's illustrative exhibit C; a tablet, plaintiff's illustrative exhibit D; a lozenge, plaintiff's illustrative exhibit E; a troche, plaintiff's illustrative exhibit F; an ampoule, plaintiff's illustrative exhibit G; a jube, plaintiff's illustrative exhibit H; powders in medicinal doses, plaintiff's collective illustrative exhibit I. Each of the specified forms denotes a definite dosage for a drug to be administered *per se*. The medicinal under consideration is wholly dissimilar because, as imported in the quantity of its container, it is raw material to be manufactured into effective dosages, as hereinabove set forth.

An ampoule is a hermetically sealed glass container, usually oblong in shape, with a capacity of from 1 to 20 cubic centimeters. Ordinarily, noncorrosive glass of special class or quality is used to suit the peculiar use of an ampoule, i. e., to maintain the sterility of a sterile preparation. The contents of an ampoule are sufficient for a single or an individual use only.

The container in question is not an ampoule. Neither its contents nor its purpose is that of an ampoule. The cedilanid substance is not sterile and the hermetically sealed glass container does not change or

improve the condition of the drug but only protects it from outside elements. The powdered medicinal substance is not ready for its recognized use as a remedy for heart ailments. On the contrary, it must be further manufactured into proper dosage form for its therapeutic property to function successfully. Furthermore, tests of the glass reveal it is ordinary chemical glassware and not of a quality suitable for holding a sterile preparation, as required of an ampoule.

Although the testimony of defendant's four witnesses is consistent in reaching the same conclusion, their views are highly divergent from those stated by plaintiff. Each regarded an ampoule as any hermetically sealed glass container, somewhat cylindrical or bulbous in shape, and having a narrow neck that can be readily fused. Neither the size of the article, nor the nature or quantity of its contents is of any consequence. Illustrative of the testimony are three glass containers with bulbous bodies and elongated necks, i. e., defendant's illustrative exhibit K, containing 1 pound of the chemical element, bromine; defendant's illustrative exhibit L, used for holding 500 grams of Vitamin E; defendant's illustrative exhibit M, bearing no label, but with a capacity comparable to said defendant's illustrative exhibit L.

Counsel for defendant, in the course of the trial, conceded that no attempt was made to establish commercial designation, so the witnesses' expressions are personal opinions. As the common meaning, therefore, becomes controlling, definitions are quoted from recognized dictionaries and authoritative publications.

Funk & Wagnalls New Standard Dictionary, 1941 edition, defines the word "ampoule" as "A vial containing one dose of a hypodermic solution."

Webster's New International Dictionary contains this definition— "ampoule, * * * A small bulbous glass vessel, hermetically sealed, for holding a solution for hypodermic injection, usually one dose."

Van Nostrand's Scientific Encyclopedia, 2d edition, 1947, defines an "ampoule" as "A small sealed glass container for drugs that are to be given by hypodermic. As they are completely sealed, the contents are kept in their original sterile condition."

The National Formulary, an official compendium recognized in the Federal Food, Drug, and Cosmetic Act, 21 U. S. C. (1946 edition) § 321, says that "Ampuls are hermetically sealed containers, commonly made of glass and, when filled, contain sterile preparations, usually solutions or suspensions of drugs, intended for parenteral use."

The Dispensatory of the United States of America, 24th edition, 1947, contains the following:

Ampuls are hermetically sealed containers commonly made of glass and, when filled, contain sterile preparations, usually solutions or suspensions of drugs,

intended for parenteral use. The terms "parenteral" and "for injection" refer to administration into or through one or more layers of the skin or mucous membrane. In the United States Pharmacopoeia each preparation packaged in ampuls and intended for parenteral administration, is designated an "injection," but the term "ampuls" is officially recognized as a synonym. In this National Formulary the same types of preparations are designated as "ampuls" with the term "injection" recognized as a synonym. The contents of National Formulary ampuls are referred to in this section as "ampul solutions" and "ampul suspensions." The provisions of this section apply to all National Formulary ampul solutions and suspensions, unless otherwise stated in the individual monograph, and to other National Formulary preparations for which compliance is indicated in the individual monograph.

None of the foregoing definitions reflects the extremely broad interpretation applied by defendant's witnesses. On the contrary, they very clearly lend support to the restricted meaning, characteristic of plaintiff's proof. The limitation, drawn from the ordinary meaning, ties in completely with the use of the word, "ampoule," in paragraph 23, *supra*, where it appears among an enumeration of terms, all of which are indicative of a single or individual dosage, as exemplified by plaintiff's illustrative exhibits B to I, *supra*.

Counsel for defendant, in their brief, argue against using "dosage" as the criterion for classification of drugs in ampoules under said paragraph 23, and in support thereof cite several cases. A brief reference to each follows.

Many of defendant's citations turned on the court's finding that the imported substance was a medicinal or a chemical. *Stone & Downer* v. *United States*, 27 Treas. Dec. 348, T. D. 34864; *American Express Co.* v. *United States*, 28 Treas. Dec. 1193, Abstract 37925; *Vidal Hnos & Co. et al.* v. *United States*, 47 Treas. Dec. 180, T. D. 40688; *Clay-Adams Co.* v. *United States*, 61 Treas. Dec. 393, T. D. 45475; *Smith & Sons Manufacturing Co.* v. *United States*, 15 Ct. Cust. Appls. 277, T. D. 42468. In all of those cases, the container was an ampoule but no question was raised thereto, so none of them had occasion to—and they did not—discuss the question presented here.

*United States* v. *Lilly & Co. et al.*, 14 Ct. Cust. Appls. 332, T. D. 41970, is not in point. There, the merchandise consisted of empty glass ampoules that were held to be classifiable, in the absence of a specific provision for "ampoules," under an *eo nomine* designation for "vials" in paragraph 217 of the Tariff Act of 1922, as adopted by the collector, rather than as blown-glass articles, not specially provided for, as the importer had claimed.

*Vandegrift & Co.* v. *United States*, 21 Treas. Dec. 155, T. D. 31830, arose under the Tariff Act of 1909, and involved paragraph 65 thereof which contained a *proviso* to include classification under said paragraph of "chemicals, drugs, medicinal and similar substances   *   *   * imported in capsules, pills, tablets, lozenges, troches, or similar forms."

The case concerned a solution of hydrochlorate of quinine in sealed glass tubes (ampoules). The Board of General Appraisers found that the glass tubes or ampoules did not conform in appearance or adaptability in use to any of the forms enumerated in said *proviso* which "are so prepared that they can be administered in their entirety." Under the principle of *ejusdem generis*, the merchandise was excluded from said paragraph 65. The decision contains no description of the so-called ampoule there involved, nor is there any other source available at this time from which to learn just what kind of a container was the subject of classification. Of greater importance, however, and a very definite—if not, the controlling—distinction between the present case and the cited one is the difference in statutory language affecting each. The term "ampoules," omitted from paragraph 65 of the Tariff Act of 1909, was embodied in the corresponding paragraphs of subsequent tariff acts, i. e., paragraph 17 of the Tariff Act of 1913; paragraph 23 of the Tariff Act of 1922; and paragraph 23 of the Tariff Act of 1930.

The significance of the added specific designation, "ampoules," was expressed as early as February 10, 1928, in *Barletta Trading Co.* v. *United States*, 53 Treas. Dec. 191, T. D. 42603, where the merchandise under consideration consisted of calcined magnesia imported in tin containers about 2 inches wide. The collector's classification under paragraph 23 of the Tariff Act of 1922 was based on the presumption that the container held only one dose of the medicinal substance. In reversing the action of the collector, and excluding the merchandise from said paragraph 23, the court said that "the tin container here involved contained more than a single dose and is totally unlike the capsules, pills, tablets, lozenges, troches, ampoules, and jubes mentioned in paragraph 23." The product was, therefore, held to be classifiable under a provision for medicinal calcined magnesia in paragraph 50 of the Tariff Act of 1922.

What was said of the tin container discussed in the *Barletta Trading Co.* case, *supra*, is equally applicable to the hermetically sealed glass container involved herein, and under the doctrine of *ejusdem generis*, invoked in the cited case, the receptacle is not an ampoule or a similar article to any of the forms designated in paragraph 23 of the Tariff Act of 1930.

In adopting "dosage" as the controlling factor for determining the types or classes of articles contemplated under the provisions of paragraph 23 of the Tariff Act of 1930, we are consistent with a report titled "Suggested Reclassification of Chemicals, Oils, and Paints," prepared and submitted by the United States Tariff Commission to Congress, on March 28, 1921, when legislation, ultimately enacted as the Tariff Act of 1922, was being considered. Recom-

mending language that finally appeared in paragraph 23 of the Tariff Act of 1922, the Tariff Commission said:

The first clause of paragraph 17 [Tariff Act of 1913], which provides for chemical and medicinal compounds, etc., when put up in individual packages of 2½ pounds or less gross weight, was new legislation in 1913. It has been especially difficult to administer and its interpretation has repeatedly been before the Board of General Appraisers and the Court of Customs Appeals. It is believed that the administration of the chemical schedule will be facilitated and considerable litigation avoided by omitting the first part of the present paragraph 17, and, as in tariff acts prior to 1913, limiting the paragraph to chemical and medicinal compounds, etc., when put up in *capsules, pills, and ampoules, for individual use.* [Italics added.]

The intent of Congress in framing this provision was presumaby to provide a slightly higher rate of duty for articles which have been put up into packages suitable for retail distribution. * * *

The foregoing quotation becomes increasingly important through the fact that the statutory language under discussion (paragraph 23 of the Tariff Act of 1930), is substantially the same as its predecessor paragraph of the Tariff Act of 1922, which, it is not unfair to say, was the direct result of the cited report.

Reenactment of the language in said paragraph 23 of the present tariff act, following the statutory construction announced in the *Barletta Trading Co.* case, *supra*, has the effect of legislative sanction of the judicial interpretation given in that case. *United States* v. *Post Fish Co.*, 13 Ct. Cust. Appls. 155, T. D. 41022. As stated in our recent decision in *Walker Services* v. *United States*, 24 Cust. Ct. 190, C. D. 1230, classifying wool flocks, "It is not necessary that similar merchandise must be present in the later case to invoke the rule of legislative ratification of statutory construction. If the statute judicially construed 'is thereafter reenacted without change, it is presumed that Congress was aware of such judicial construction and approved the same,' *Quong Yuen Shing Co.* v. *United States*, 31 C. C. P. A. 43, C. A. D. 247."

That the provision in paragraphs 5 and 23, as amended, *supra*, is for "digitalis glucosides, * * * whether or not in any form or container specified in paragraph 23," is no bar for classification of the present merchandise as an advanced drug under paragraph 34, as modified, *supra*. The trade agreement with Switzerland, T. D. 48093, *supra*, where the above-quoted language appeared for the first time, intended to change the rate of duty only on articles already embraced within the scope of either paragraph 5 or 23. *United States* v. *Canadian National Railways*, 29 C. C. P. A. 272, C. A. D. 202. The cedilanid substance in question, being a chemical compound and also an advanced drug, is more specifically provided for as a drug, *Roche-Organon, Inc.* v. *United States*, 35 C. C. P. A. 99, C. A. D. 378. The merchandise in question is, therefore, classifiable as a drug, advanced

in value or condition, under said amended paragraph 34, and dutiable thereunder at 5 per centum ad valorem, as claimed by plaintiff.

The protest is sustained and judgment will be rendered accordingly.